**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**

FILED

| | |
|---|---|
| **_ADRIAN CROSS_**         , | ) |
| PLAINTIFF | ) |
| | ) |
| _V._ | ) |
| | ) |
| | ) |
| **ROB FRAZIER, TERRY FREEMAN,** | ) |
| **JEREMY GARVIN, Dr. COOPER, and** | ) |
| **TURN KEY HEALTH CLINICS, LLC.** , | ) |
| DEFENDANTS | ) |
| | ) |

JUN 0 2 2020

PATRICK KEANEY
Clerk, U.S. District Court

By_____
Deputy Clerk

CASE No. **_CIV-18-081-DAK-DBP_**

**_SUPPLEMENTED/AMENED COMPLAINT_**

SUPPLEMENTED/AMENED COMPLAINT

**COMES NOW  Plaintiff, Adrian Cross ( "Plaintiff"or "Mr. Cross"), and for his causes of action**
**against the here named Defendants, alleges and states as follows:**


I.                          PARTIES JURISDICTION AND VENUE


1. Plaintiff is a citizen of Oklahoma.

2. Defendant Turn Key Health Clinics, LLC.[1] ("TURN KEY") is an Oklahoma limited
liability company doing business in Muskogee County, Oklahoma.  TURN KEY is a private
correctional health care company that contracts with counties, including Muskogee County, to
provide medical professional staffing, supervision and care in county jails.  TURN KEY was at all
times relevant hereto responsible, in part, for providing medical services, supervision and
medication to Mr. Cross while he was in the custody of the Muskogee County Sheriff's Office
("MCSO").  TURN KEY was additionally responsible, in part, for creating and implementing
policies, practices and protocols that govern the provision of medical and mental health care to
inmates at the Muskogee County Jail, and for training and supervising its employees.  TURN KEY
was, at all times relevant hereto, endowed by Muskogee County with powers or functions
governmental in nature, such that TURN KEY became an agency or instrumentality of the State
and subject to its constitutional limitations.

3. Defendant Rob Frazier ("Sheriff Frazier" or "Defendant Frazier") was the Sheriff of
Muskogee County, Oklahoma, residing in Muskogee County, Oklahoma and acting under color
of state law. Sheriff Frazier is sued in his  individual capacity.  It is well-established,
as a matter of Tenth Circuit authority, that a § 1983 claim against a county sheriff in his official
capacity "is the same as bringing a suit against the county." _Martinez v. Beggs,_ 563 F.3d 1082, 1091
(10th Cir. 2009). _See also Porro v. Barnes,_ 624 F.3d 1322, 1328 (10th Cir. 2010); _Bame v. Iron Cnty._,
566 F. App'x 731, 737 (10th Cir. 2014).  Thus, in suing Sheriff Frazier in his official capacity,
Plaintiff has brought suit against the County/MCSO.

4.  Defendant Terrry Freeman later replaced Rob Frazier as elected Sheriff and is being held to
answer plaintiff's claims against the Muskogee County's Sheriff' in his official capacity.

_____
[1] Defendants "Turn Key LLC. and Dr. Cooper were granted dismissal, see..[ECF No.89] filed on 03/02/2020.

5. Defendant "Dr. Cooper" [1] was at all times relevant hereto, an employee and/or agent of Turn Key/the County/MCSO, who was, in part, responsible for overseeing Mr. Cross's health and well-being; and assuring that Mr. Cross's medical/mental health needs were met, during the time he was in the custody of MCSO. At all times pertinent, Dr. Cooper was acting within the scope of his/her employment and under color of state law.

6. Defendant "Jeremy Garvin (hereinafter, "Defendant" or ""Mr. Garvin") a citizen of Oklahoma was the Administrator of the MCSO at the time of the events that give rise to this claim. At all times pertinent, Mr. Garvin was acting within the scope of his/her employment and under the color of state law. Mr Garvin is being sued in his/her individual capacity.

7. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Fifth, Eighth and Fourteenth Amendments to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law. Venue is proper under 28 U.S.C. § 1391(b) because the events or omissions giving rise to Plaintiff's claims occurred in this District.

8. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367, since the claims form part of the same case or controversy arising under the United States Constitution and federal law.

## II.                          STATE LAW AND CONSTITUTIONAL CLAIMS

### (i)            State law Claims

9.  OK. Title 57 § 57-53, imposes a statutory obligation of duty to the Sheriff and the Administrator of the (MCJ), to  inspect the facility monthly. 2018 Oklahoma Statutes Title 57. Prisons and Reformatories §57-53. Monthly inspections. Universal Citation: 57 OK Stat § 57-53 (2018) The sheriff or designated employee shall visit the county jail in person and inquire into the condition of each prisoner at least once each month and it shall be his duty to comply with all standards promulgated pursuant to Section 192 of Title 74 of the Oklahoma Statutes. OK. Title 57 §57-9 "prohibits any officer or other person from treating any prisoner in a cruel or inhumane manner.

10.  Plaintiff has named individuals who violated his rights under the constitution and statutes of the State of Oklahoma, in their individual capacity. Article II  § 7 and  § 9) 1, prohibits the infliction of cruel and unusual punishment.. under  § 7, the right to be free from cruel and unusual punishment extends to pre-trial detainees who have yet to be convicted of a crime. Plaintiff  has  outlined the violations that the facility contained and subject the plaintiff to. That the violations were not addressed by the defendant after being informed of there existence.

11.  O.S. § 23-3(R.L. 1910, § 2845)  gives the plaintiff "Right to Damages" [a]ny person who suffers detriment from the unlawful act or omission of another, may recover from the person in fault a compensation therefore in money, which is called damages. In any action arising from negligence in the rendering of medical care, a presumption of negligence shall arise if the following foundation facts are first established:
   a)  The plaintiff sub-stains [any] injury;
   b)  said injury was proximately caused by an instrumentality solely within the control of the defendant or defendants; and
   c)  such injury dose not ordinarily transpire under the circumstances absent negligence on the part of the defendant. O.S. § 76-21(1976 c.44, §5, emerg sff. April 8,1976).

---

[1]  Defendants "Turn Key LLC. and Dr. Cooper were granted dismissal, see..[ECF No.89] filed on 03/02/2020.

(ii)                                        Federal Constitutional Claims

12. CRUEL AND UNUSUAL PUNISHMENT OF INMATE/PRISONER, PUNISHMENT OF A PRETRIAL
DETAINEE, IN VIOLATION OF THE FIFTH, EIGHTH AND/OR FOURTEENTH AMENDMENT(S) TO
THE CONSTITUTION OF THE UNITED STATES (42 U.S.C. § 1983) .
(a) The Supreme Court has interpreted the **Fifth** Amendment's Due Process Clause as providing two main
protections: procedural due process, which requires government officials to follow fair procedures before
depriving a person of life, liberty, or property, and substantive due process, which protects certain fundamental
rights from government interference.
(b) The Supreme Court has ruled that the **Eighth** Amendment's Cruel and Unusual Punishment Clause applies
to the states as well as to the federal government.
(c) U.S. Supreme Court Justice Joseph P. Bradley commented in the Civil Rights Cases that "individual invasion
of individual rights is not the subject-matter of the **Fourteenth** Amendment. It has a deeper and broader scope.
It nullifies and makes void all state legislation, and state action of every kind, which impairs the privileges and
immunities of citizens of the United States, or which injures them in life, liberty or property without due process
of law, or which denies to any of them the equal protection of the laws.

13. Plaintiff avers, that Defendants Dr. Cooper, (Sheriff , Administrator and other agents of MCJ and/or Turn
Key as described, but who cannot yet be identified by name) knew there was a strong likelihood that Mr. Cross
was in danger of serious personal harm due to his recent medical history, complaints of a shortness of breath,
excessive bleeding, *plaintiff was expelling blood from his dear-ducts,* his progressing and worsening lose of
mobility,his inability to perform everyday life functions, complaints of weakness, pain, failing to get out of
bed for meals or pill calls. As described supra, Mr. Cross had serious and emergent medical issues that were
known and obvious to these Defendants and other unnamed MCSO and Turn Key employees/agents.

14. In this case, plaintiff claims that the Defendants and the Defendant's employee nurse violated the
Constitutional rights of plaintiff by being deliberately indifferent to his serious medical needs and the
state of the (MCJ) condition incarceration. Plaintiff provides factual allegations setting forth particularized
descriptions of actions taken or not taken by the individual defendants that plausibly support these claims.

15. In addition, MCSO has utterly failed to train its detention staff in how to properly care for or supervise
inmates, like Mr. Cross, with complex or serious medical and mental needs, with deliberate indifference to
the health and safety of those inmates.  A duty imposed on the Sheriff of Muskogee County by Title 57 of
the Oklahoma Statutes. §19-513.1. states," every Sheriff shall require appropriate training for jailers in ac-
cordance with the jail standards promulgated by the Department of Health".

III.                                        STATEMENT OF FACTS

16. On or about Oct, 2016, Plaintiff Adrian Cross and his Wife and coconspirator as charged Lonetta Cross
were driven from the Federal Transfer Center in Oklahoma City to the (M C S O), To be housed as Federal
Pretrial Detainees in the custody of the U.S. Marshal. Transported by a Muskogee County Deputy and a U.S.
Deputy Marshal.

17. Plaintiff was booked into the Muskogee County Jail ("Jail"). Upon booking, Mr. Cross reported to the
booking personnel employed by the Muskogee County Sheriff's Office ("MCSO") and Turn Key Health
Clinics, LLC ("Turn Key") that he had been  receiving his medications at the Federal Detention
Center in OK City an advised MCSO and Turn Key personnel that he was prescribed several medication and
that they had been transported with him, as it was time to administer them he requested they do so.The Turn
Key nurse additionally observed that Mr. Cross was prescribed serious medications, as among the
several bottles there were "heart medication, Blood Thinners, and mental medications".

18.     Plaintiff made continued requests to the jail's Administrator to receive clean drinking water as the sink
in the plaintiff's cell did not dispense water with enough pressure to be drank. The request was not complied
with despite the number of requests or the fact he expressed his medical reasons to Administration and
Turn Key Medical staff. Plaintiff also pointed out that Coolers of clean Drinking Water was supplied to
other inmates in the jail on a daily basis, nor did the inmates in Pod #8 get to leave the crowded pod for
exercise on a regular basis. The Jail's administration and/or individual guards action were tantamount to
punishment, by denying access to clean drinking water to Pod #8, when it was made available to other
Pods in the jail, or not allowing regularly accessed yard time to Pod#8 because of overcrowding the
dayroom floor full of floresleepers. And "because it was not related to a legitimate goal", *see Pierce v.
County of Orange*, 5226 F.3rd 1190 (9th Cir. 2008) Court held there was no legitimate reason for pretrial
detainees in the SHU to only get 90 min of exercise per week. Pretrial detainees have not received a formal
adjudication of the charges against them and as such are beyond the power of the state to punish.
*see Bell v. Wolfish,* 441 U.S. 520, 523, 99 S. Ct. 1861, 1865, 60 L. Ed. 2d 447 (1979) ).
They are therefore accorded the due process protected under the *fourteenth amendment*.

19.     Plaintiff avers "An unnamed nurse, employee of Turn Key and the (MCJ), did purposely, with
malice and intent to cause harm, withhold plaintiff's mental medications, for several doses. she willfully
and wantonly failed to administer prescribed treatment." While ignoring the pain and mental anguish the
plaintiff suffered, for thee (3) days, before informing a doctor." this action was also contrary to guidelines of
administering of such medications, see..exhibit.. and was carried out under the color of state law. This act the
plaintiff contends violate the plaintiff's rights under 8th and 14th amendment to the US. Constitution, to be
free from cruel and unusual punishment, moreover in this case to be free from punishment, as plaintiff was
a pretrial detainee, to which punishment is prohibited.

20.     Plaintiff Cross points to a heated discourse between the employee nurse and himself questioning her
qualifications, as the reason the nurse was withholding the medication, as a display of control or to punish the
plaintiff.

21.     57 OK Stat § 57-53 (2018) state, [t]he sheriff or designated employee shall visit the county jail in person
and inquire into the condition of each prisoner at least once each month and it shall be his duty to comply
with all standards promulgated pursuant to Section 192 of Title 74 of the Oklahoma Statutes. The defendants,
Sheriff and Administrator of the (MCJ), can not claim no knowledge of the unsanitary, overcrowded, sub-
minimum standards present at the (MCJ). [as] the statute mandate a firsthand knowledge of such conditions,
of the facility, and each prisoner at least once a month.

22.     Wherefore, plaintiff avers, the Sheriff and Administrator would be in violation of statutory duty if
they chose not to perform the monthly inspection, or moreover violate the rights of the plaintiff when/if
they turned a blind eye to the unconstitutional conditions complained [2] about, breaching the duty of care.
*see..Wood v. Strickand* 420 US. 308, 95 Sct 92(1975), If the Sheriff and Administrator, violate the inspection
guidelines, there will be no shelter from liability.

23.     Plaintiff Cross was returned to custody, in July 2019. Sentenced to nine (9) months and held at the
(MCJ) under the custody of the (USMS) until transfer to the custody of the (BOP) in early December 2019.
during this time the plaintiff complained to the court about the situation of being housed in a facility that
was a defendant in this civil action, who also now had control of the plaintiff's incoming and outgoing
legal mail. Plaintiff believed this to be a conflict of interest in the least.

---

[2] see exhibits listing unconstitutional conditions of the (MCJ) an the complaints made about them by inmates
including plaintiff at the time that gave rise to this action.

24.     Plaintiff claims to not have received several parcels of legal mail, the court states it mailed to the plaintiff, and plaintiff contends that he did not receive the court's mailing of the case documents requested at all, from July thru his departure in December, 2019. Plaintiff also avers mail was being returned to his home and family by the defendant facility (MCJ) as well. Plaintiff asks "dose this act give rise to a procedural due process claim under §1983", [yes] because the act "deprived the plaintiff of property", under the color of state law and at a minimum, cause a delay in access to the courts...but could also effectively deny access to obtaining an attorney, filing a complaint, or mailing other legal documentation.

25.     Plaintiff also contends the act was carried out directly and with the malice intent of defendants to undermine the integrity of the proceedings., as this situation forced plaintiff to file mere boiler plate responses to Defendant's 12(b)(6) motion to dismiss to remain timely, and clearly limited the plaintiff's ability to argue the efficient or deficient facial and/or factual content of the complaint, whether or not if the complaint was deficient. Thus, for the relevance that depend on fact, the plaintiff had right to possess a copy of the case documents if only for reference to facts therein. Plaintiff feels this act aided the dismissal of Defendants "Dr. Cooper and Turn Key Healthcare LLC."

26.     The aforementioned state a cause of a cognizable or actual injury, wherefore plaintiff should be allowed relief.


IV.                          POINTS OF AUTHORITY


27.     Plaintiff's complaint in this case clearly affords fair notice of the nature and basis of the claim asserted and a general indication of the type of litigation involved. It informs defendants that plaintiff is suing to recover damages, for the deprivation of clearly established constitutional and statutory rights of the plaintiff to receive adequate Medical Care, to be free from punishment and enjoy the right to due process.

28.     The (MCJ)/ Turn Key employee nurse who refused plaintiff's mental medication, had been endowed by Muskogee's County Sheriff with powers or functions governmental in nature, such that Turn Key nurse became an instrumentality of the State and subject to its constitutional limitations.

29.     Plaintiff need not allege or prove a complete denial of care in order to plausibly allege or establish deliberate indifference. *See, e.g., Oxendine v. Kaplan,* 241 F.3d 1272, 1277 n. 7 (10th Cir. 2001) (reversing summary judgment for defendants on deliberate indifference claim and rejecting government's argument that it was "dispositive … that *Oxendine* received at least some treatment from Dr. Kaplan during the time period when he alleged that he received inadequate and delayed medical care."); [*Hunt v. Uphoff,* 199 F.3d 1220, 1224 (10th Cir. 1999)] ("[T]he fact that [plaintiff] has seen numerous doctors [does not] necessarily mean that he received treatment for serious medical needs, i.e., that treatment was prescribed at all or that prescribed treatment was provided."). *See also McElligott v. Foley,* 182 F.3d 1248 (11th Cir. 1999) (sufficient evidence to show that doctor and nurse were deliberately indifferent to inmate's pain, although some care was provided); *Young v. City of Augusta, Ga. Through DeVaney,* 59 F.3d 1160, 1170, 32 Fed. R. Serv. 3d 1438 (11th Cir. 1995) (although plaintiff received some treatment and medications, gaps in chart and other evidence raised triable issues regarding undue delay in providing treatment and provision of medications as prescribed); *Hathaway v. Coughlin,* 37 F.3d 63 (2nd Cir. 1994) (jury resolution required where defendant claimed to have engaged in adequate course of treatment, but deliberate indifference could be inferred from facts indicating that surgery had been required); *Durmer v. O'Carroll,* 991 F.2d 64 (3rd Cir. 1993) (plaintiff was seen by doctor and referred to specialists, but deliberate indifference was demonstrated by the failure to provide him with physical therapy); *Waldrop v. Evans,* 871 F.2d 1030, 1033 (11th Cir. 1989) (in a case involving failure to give adequate psychiatric care, held that "grossly incompetent or inadequate care," or a "doctor's decision to take an easier and less efficacious course of treatment" would constitute a violation).

30.     The contract entered between the US. Marshal Service (USMS) and the (MCJ)
Id..IGA #63-02-0020 established the specific provisions and requirements of the agreement including the
*compensation* that Muskogee County would receive. (MCJ) is required by the terms of the contract to
comply with Bureau of Prisons rules and regulations prescribing standards of treatment and to allow
**inspections to ensure compliance**, this contract signed by defendant "Jeremy Garvin", as to accept the
terms therein. Plaintiff charges that this defendant and the Sheriff "Rob Frazier" had a contractual duty
to maintain the (MCJ) at the minimum required condition, with an obligation to ensure the health and
safety of the detainees housed therein. However the inspection results shall reveal the ugly truth.


31.     The County/MCSO, through its continued encouragement, ratification, approval and/or
maintenance of the policies, customs, and/or practices of turning a blind eye to the conditions, and
maintenance needed in the (MCJ);(cell doors that do not close or lock, faulty pluming, no drinking
water, severe overcrowding, unsanitary conditions of inmate living quarters, no clean clothing
dispensed regularly, ect). in spite of their known and obvious inadequacies and dangers; has been
deliberately indifferent to the health and safety of inmates, including "Mr. Cross".

32.     Plaintiff also charges the unnamed Turn Key/ (MCJ) employee nurse with (negligent infliction
of emotional distress), (medical gross negligence), and charges the Sheriff/(MCJ) with (gross negligence
in the hiring, training and retention of employees).

33.     Though qualified immunity is available, however jail officials must be acting sincerely and
with the belief that he or she is doing right to receive immunity. However, an act that violates an inmate's
constitutional rights cannot be justified by ignorance or disregard of settled, indisputable law on the part
of one entrusted with the supervision, health and safety of the inmates in their charge. [a] plaintiff who
seeks damages for violation of constitutional or statutory rights may overcome the official's qualified
immunity by showing that those rights were clearly established at the time of the conduct at issue.

34.     Plaintiff avers to have engaged in several requests and dialog with Administrator " Jeremy Garvin"
about the care of the cell and pod, as well as the afore mentioned sink water dispensing problem.. Nothing
was done..he did no dispatch a crew to undertake the repairs to solve the issue, nothing was done to right
the situation, it's as if he forgot I was a person.

35.     "Person".—The Due Process Clause provides that no states shall deprive any "person" of "life,
liberty or *property*" without due process of law. Plaintiff is charging that the Sheriff /(MCJ), deliberately
withheld/failed to deliver several parcels of personal and legal mail. "Property" and Police Power.—States
have an inherent "police power" to promote public safety, health, morals, public convenience, and general
prosperity, but the extent of the power may vary based on the subject matter over which it is exercised. If a
police power regulation goes *too far,* it will be recognized as a taking of property for which compensation
must be paid. Thus, the means employed to effect its exercise may be neither arbitrary nor oppressive but
must bear a real and substantial relation to an end that is public, specifically, the public health, safety, or
morals, or some other aspect of the general welfare. This mail was send to the plaintiff by the court, and
posed no danger to facility operation or safety.
Prisoners clearly have a constitutionally protected right of access to the courts. *See Lewis v. Casey*,
518 U.S. 343, 350, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996) (*citing Bounds v. Smith,* 430 U.S. 817,
97 S. Ct. 1491, 52 L. Ed. 2d 72 (1977)).

36.     Under § 1983, a plaintiff must plead a depravation of a constitutional right by a person acting
under the color of state law. *see Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902,907 (3d Cir. 1997).

37.     The Sheriff "Terry Freeman" (MCJ) and Turn Key are vicariously liable for the violations of
the Oklahoma Constitution by employees and agents acting within the scope of their employment.
*See Bell v. Wolfish,* 441 U.S. 520, 545 (1979); *Martin v. Bd. of County Com'rs of County of Pueblo*,
909 F.2d 402, 406 (10th Cir. 1990).

**WHERFORE,** based on the foregoing, Plaintiff prays this Court grant him the relief sought, Plaintiff Cross seeks compensatory damages in the amount of Two hundred twenty five thousand $225,000.00 dollars against the named defendants jointly and severily. The plaintiff also seeks punitive damages in the amount of One Million three hundred seventy five $1,375,000.00 thousand dollars against the defendants.(for intentional, reckless disregard of his rights) in excess of One million, five hundred and fifty Thousand Dollars ($1,550,000.00), with interest accruing from the date of filing suit, the costs of bringing this action, Plaintiff seeks a jury trial on all issues triable by jury, along with such other relief as is deemed just and equitable.

Respectfully submitted,

Adrian Cross *Pro Se*
604 Denver st.
Spiro, OK. 74959

sign: _Ado Cross_
date: _6-1-2020_

## VERIFICATION

I have read the forgoing complaint and hereby verify that the matters alleged on information and belief I believe to be true. I certify under penalty of perjury that I believe the foregoing is true and correct.
Executed in panama, Oklahoma on date:_____ _6-1-2020_

_Adl Cross_

Adrian Cross

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| Adrian Cross, | ) | |
| PLAINTIFF | ) | Case NO.  6:18-cv-81-DAK-DBP |
| | ) | |
| v. | ) | |
| | ) | |
| Terry Freeman, Rob Frazier, et al, | ) | **DECLARATION OF** |
| DEFENDANT | ) | **ADRIAN CROSS** |
| | ) | |

## DECLARATION OF ADRIAN CROSS

I Adrian Cross, hereby declares:
I am the plaintiff herein.

At this time I declare the issues asserted in the complaint, that the conditions at the Muskogee County Jail, (hereinafter, (M.C.J.)), were in fact as such to warrant two (2) causes of action against Dr. Cooper, Sheriff Frazier, and Jeremy Garvin under 42 U.S.C. § 1983, [t]he complaint was originally filed on March 16th, 2018. and Amended on May 7th, 2018. Filed for a deprivation of plaintiff's federal constitutional rights. To it the1st, 8th, 5th and 14th amendments(Due Process) The "serious medical need" requirement which contemplates a condition of urgency,one that may produce death, degeneration, or extreme pain. It goes on to also assert that following conditions at the (M.C.J.) , The failure to supply clean drinking water, safe and secure housing with cell doors that are able to be closed and or locked, severe overcrowding and unsanitary conditions that violate standards set forth by the American Correctional Association (A.C.A.) and State fire code laws, The denying of free access to a Law Library. These in addition to the service of meals that failed to meet minimal nutritional guidelines set forth by the (A.C.A.) and the, Federal Bureau of Prisons (B.O.P.) Clinical Guidance. As a Federal pretrial detainee, to be housed in such conditions do indeed violate my rights under the fourteenth amendment of the U.S. Constitution. Which are to be held in equal or better  standard of the eighth amendment rights of a prisoner. I would also assert the conditions that I was forced to endure were stated and plainly brought to the attention of the Administrator Jeremy Garvin, and his supervisor and  Warden (custodian) of the (M.C.J.) Sheriff Rob Frazier. But they did nothing to remedy the conditions nor to amend or re-institute policy and procedural change that would remedy the constitutional violations. I was incarcerated at the (M.C.J.) from Oct, 2016  to  April, 2017 and during this time the injustice I experienced was shared by others who surely complained as I did...   I would like to direct the court at this time to:

(1) Doc 3 of *Zuniga - Griffin v. Muskogee County*, No. CIV 16-540-RAW-KEW.
Wherein Holly Tegan Zungia - Griffin (petitioner) A pretrial detainee who also raised issues that in fact were not proper for a habeas action, but however she did allege "inhumane living conditions in the jail, negligent medical care by jail medical staff, and mistreatment of inmates by jail staff." this document was filed in the U.S. District Court for the Eastern District of Oklahoma, and names Rob Frazier, Muskogee County Sheriff as (respandant). The following order to file an amended petition was dated April 5th, 2017. I would also direct the court to:

(2) Doc 6 of *Coffey v. Muskogee County*, No. CIV 17-077-RAW-KEW. Wherein Amanda Jane Coffey (petitioner) raised allegations concerning the conditions of her confinement at (M.C.J.). "She complains that the jail is overcrowded and unsanitary. Inmates allegedly sleep on  the floor and are denied mats, blankets, towels, hygiene items, and clean jumpsuits for days at a time. In addition , she alleged there are safety issues with hazards such as malfunctioning doors, and inmates regularly are depraved of water for 12-18 hours. (Dkt. 1 at 13, 16)." this document was filed in the U.S. District Court for the Eastern District of Oklahoma, and names Rob Frazier, Muskogee County Sheriff as (respondant). The following order to file an amended petition was dated April 11th, 2017.

I would also at this time wish to direct the court to:

A news article dated August 26st, 2016 written by Harrison Grimwood, of "The Muskogee Phoenix News Paper" wherein it states, "Overcrowding an ongoing problem at Okla. jail". The pods at Muskogee County Jail are designed to house 26 inmates; they currently house 57 inmates each. It goes on to state that an inmate "Roy Thompson", was one of five people sharing a cell designed for three people. He was quoted to say"It's crowded. I don't get much sleep," Thompson said. "I can stay up 48 hours just because it's so loud." More than a dozen inmates sleep in "boats" and pads on the floor of Thompson's pod. He shares his cell with four other inmates. His pod, designed to house 26 inmates, housed 57 inmates on Tuesday. The "boats" — large plastic bins that raise inmates off the floor — and the sleeping pads line the walls, are tucked under stairs, and take up floor space in the cells. The article went on to say, "The detention facility, an inconspicuous building that nearly blends into the Muskogee Police Department next door, was 150 percent overcapacity last week with a total of 425 inmates, the jail, which is only supposed to hold 282 inmates, set a record. Inmates said they have seen the size of their meals — regardless of complaints or praises of the food quality — fluctuate with the number of inmates. As of Tuesday, 49 inmates were waiting to start their prison sentences with the DOC; 60 inmates are holds for the United States Marshal Service, at least 19 are people who failed to pay their fines and about another 50 inmates are people who failed to appear in court when they were supposed to, Jail Administrator Jeremy Garvin said."(The meals) have always been small, but toward the end of the month, they get smaller," inmate Stanley Powers said. Garvin said they have to feed more inmates with the same amount of food.

Oklahoma State Department of Health spokesman Cory Robertson said the department of health has cited jails for overcrowding. "[T]his issue is common and it is up to the jail to correct," Robertson said. Muskogee inmates are credited for three days for each day they are in, Garvin said.
~ END QUOTE~

The afore mentioned documents have been copied and attached to this declaration, the above quotations and the said documents are hereby presented as an evidential support of my claim that others shared in the inhumane conditions at the (M.C.J.) that gave rise to my complaint and claims of the constitutional violation I endured. I assert that I have not met the afore mentioned petitioners, or the inmates interviewed by the Muskogee Phoenix News Paper, nor do I share any interest in there cases.

They are listed mainly to affirm my statement that the Administrator Jeremy Garvin and the Sheriff (custodian) of the inmates incarcerated in the (M.C.J.) Rob Frazier, surely had knowledge of the un-constitutional conditions by way of the complaints they received.

I declare under penalty of perjury that to the best of my knowledge the foregoing is true and correct. Executed at Spiro, OK. on ___6/1/2020___ . pursuant to 28 U.S.C. § 1746 .

sign: ___Ad Cross___                    date: ___6-1-2020___

Adrian Cross
604 N. Denver St.
Spiro, OK. 74959
318) 527-7769

## *EXHIBIT Attachment:* <u>Mismanagement of Anticoagulants (Blood Thinners)</u>

20. One of the medications the plaintiff takes *(Warfarin) is a blood thinner, and requires frequent blood draws to monitor...see attached Rx info sheet...* Plaintiff states that his *worry prompted him to request to go to the hospital to have blood drawn after such long period had past (30dys or more) without it being done.* With negligence and deliberate indifference *These requests were refused by Dr. Cooper and the Turn Key medical staff.* this was the start of the serious, emergent and potentially life-threatening medical problem. It is well-established that "the plaintiff has a blood disorder as such can and has caused uncommon, serious, and traumatic event that even someone without any medical training would ... recognize[] the situation as requiring serious care by a doctor." *Fields v. Corizon Health, Inc.*, 490 F. App'x 174, 184 (11th Cir. 2012) (emphasis added)

21. Plaintiff Cross's *medical records document several occurrences of pulmonary embolism (PE) blood clots in lungs and blood clots in the legs (DVT), as well plaintiff has had clotting to stop his heart, causing a mild stroke.* Following *proper protocol in providing a Coumadin therapy is essential to health and well-being of the plaintiff.* ("Such obvious delays of reoccurring and debilitating inconsistent treatment were clear symptoms of a serious problem, and the poor out-come on the horizon, even if Defendants did not choose to believe Plaintiff.")).

22. Plaintiff Cross states that his *medications continued to be mismanaged and that they were administered in a non-therapeutic manner,* plaintiff recalls that they were *dispensed at a wide degree of varied times,* ranging from 7am some days to noon on the following days for what was to be the morning regiment. And in some cases, *as late as 2am for what should have been the nightly pill call. Responsible MCSO and Turn Key detention and medical staff under the direction of Dr. Cooper disregarded known, obvious and substantial risks to Mr.Cross's health and safety.* And Mr. Cross suffered severe and unnecessary worsening of his condition, and a *potentially life threatening episode.*

23. Plaintiff Cross states that *there was no clean drinking water made available to him or any of the inmates in the pod,* He recalls that coolers of Iced drinking water were placed in the booking area, the staff office, the pods down stares that housed the female inmates received coolers of Iced drinking water. This fact the plaintiff said was confirmed by his wife "Mrs. Cross", and other female inmates. Plaintiff states he *made several written requests to Jeremy Garvin* explaining the fact that *his medical condition required he consume a large amount of medications, and that this in fact causes him to be very parched and need to be hydrated.* Also stated that one of the medications *in his daily regiment Furosemide (Lasix) see RX info sheet attached ..is in fact a water pill designed to flush slow-moving toxins from the kidneys and urinary tract* that are left behind by some of the other medications the plaintiff must take. The plaintiff and other inmates received a cooler of iced drinking water for one meal, and after that the plaintiff recalls they did not receive any such drinking water for the full remainder of his stay at (MCSO). MCSO and Turn Key staff could not be bothered to provide him with any assistance. He was still *not provided with clean drinking water or evaluation, of dehydration* as he deteriorated before the MCSO and Turn Key staff's eyes.

24. The plaintiff states that on or about Nov 18th, He complained to the Turn Key medical staff of extreme weakness and that he had awaken to find blood on his bedding, he stated the **blood was coming from his tear ducts.** He reported he also had **excessive blood from his mouth** during brushing of his teeth. His Blood was tested for the first time in that month, the test revealed that his pro-time *(The Time it takes blood to clot) that generally is kept at 2.0 to 3.0 maximum,* was now in the high range of **6.0 or higher.** His blood was extremely thin and he was at **risk of internal bleeding.** The *Turn Key nurse said that Dr. Cooper had ordered his blood thinners to be discontinued, pending another blood test.* The plaintiff goes on to say that *before his blood could be retested as was the protocol in that situation, a nurse restarted the blood thinners the next day at the prior dosage, this sent the plaintiff's blood back into an unhealthy state,* repeating the previous conditions of **blood being expelled from his gums and tear ducts.** Plaintiff's **request to go to the hospital where refused by the MCSO and Turn Key staff.** while, with deliberate indifference and reckless neglect, responsible MCSO and Turn Key staff provided no medical evaluation, referral, care or treatment as the seriousness to Mr. Cross's condition. *Dr. Cooper never followed up They did nothing* as Mr.Cross edged closer and closer to the point of no return.

25. Plaintiff *continued requests to receive clean drinking water was not complied with despite the facts he expressed his medical reasons to Administration and Turn Key Medical staff.* Plaintiff also pointed out that Coolers of Iced, *clean Drinking Water was supplied to other inmates in the jail on a daily basis,* nor did the inmates in Pod #8 get to leave the crowded pod for exercise on a regular basis. *The Jail's administration and/or individual guards action were tantamount to punishment, by denying access to clean drinking water to Pod #8, when it was made available to other Pods in the jail,* or not allowing regularly accessed yard time to Pod#8. *"because it was not related to a legitimate goal,* see *Pierce v. County of Orange,* 5226 F.3rd 1190 (9th Cir. 2008) Court held there was no legitimate reason for pretrial detainees in the SHU to only get 90 min of exercise per week. Pretrial detainees have not received a formal adjudication of the charges against them and as such are beyond the power of the state to punish. see *Bell v. Wolfish,* 441 U.S. 520, 523, 99 S. Ct. 1861, 1865, 60 L. Ed. 2d 447 (1979) ). They are therefore accorded the due process protected under the fourteenth amendment.

26. Sheriff Frazier as warden, and  Mr. Garvin as the administrator of the (MCSO)  at the time of the afore mentioned acts of this complaint, *violated the plaintiff's rights under the U.S. Constitution's 5th, 14th and 8th amendments. [And] showed deliberate indifference by making no attempt to correct the issues mentioned here.* **After being made aware of there existence.** [t]hough it would have been in the best interest of the safety of the Plaintiff Cross and the safety of Jail. see *Farmer v. Brennan,* 511 U.S. 825 (1994). [Under] the color of state law, Authorization might depend on a number of factors including, for example, the extent of the discretionary or supervisory power invested in the defendant, see *Stana v. School District,* 775 F.2d 122, 129-30 (3d Cir.1985)

27. The deliberate indifference[1] to Mr. Cross's serious medical and mental needs, as summarized supra, was in furtherance of and consistent with policies, customs and/or practices which the County/MCSO and Turn Key promulgated, created, implemented or possessed responsibility for the continued operation of.

28. In recent years, Defendant Turn Key has grown into the largest private medical care provider to county jails in the state.  Turn Key has used its political connections to obtain contracts in a number of counties, including Muskogee County, Tulsa County, Garfield County and Creek County.

29. Turn Key and the contracting counties, including Muskogee County, utilize common industry cost-cutting techniques which create financial disincentives to send inmates to outside medical facilities.  Under the contractual arrangements between Turn Key and the counties, there is a financial cap on the amount that can be spent on outside medical care, and any amount over this cap is incurred by Turn Key.  Thus, the less inmates are sent to the emergency room, or other outside medical provider, the more money Turn Key pockets.

---

1  Plaintiff need not allege or prove a complete denial of care in order to plausibly allege or establish deliberate indifference. See, e.g., *Oxendine v. Kaplan,* 241 F.3d 1272, 1277 n. 7 (10th Cir. 2001) (reversing summary judgment for defendants on deliberate indifference claim and rejecting government's argument that it was "dispositive ... that Oxendine received at least some treatment from Dr. Kaplan during the time period when he alleged that he received inadequate and delayed medical care."); [*Hunt v. Uphoff,* 199 F.3d 1220, 1224 (10th Cir. 1999)] ("[T]he fact that [plaintiff] has seen numerous doctors [does not] necessarily mean that he received treatment for serious medical needs, i.e., that treatment was prescribed at all or that prescribed treatment was provided."). See also *McElligott v. Foley,* 182 F.3d 1248 (11th Cir. 1999) (sufficient evidence to show that doctor and nurse were deliberately indifferent to inmate's pain, although some care was provided); *Young v. City of Augusta, Ga. Through DeVaney,* 59 F.3d 1160, 1170, 32 Fed. R. Serv. 3d 1438 (11th Cir. 1995) (although plaintiff received some treatment and medications, gaps in chart and other evidence raised triable issues regarding undue delay in providing treatment and provision of medications as prescribed); *Hathaway v. Coughlin,* 37 F.3d 63 (2nd Cir. 1994) (jury resolution required where defendant claimed to have engaged in adequate course of treatment, but deliberate indifference could be inferred from facts indicating that surgery had been required); *Durmer v. O'Carroll,* 991 F.2d 64 (3rd Cir. 1993) (plaintiff was seen by doctor and referred to specialists, but deliberate indifference was demonstrated by the failure to provide him with physical therapy); *Waldrop v. Evans,* 871 F.2d 1030, 1033 (11th Cir. 1989) (in a case involving failure to give adequate psychiatric care, held that "grossly incompetent or inadequate care," or a "doctor's decision to take an easier and less efficacious course of treatment" would constitute a violation).

5)  Plaintiff avers that (MCJ) and Turn Key employee staff negligently caused "serious physical injury" by failing to follow medical protocol in providing adequate and timely "anticoagulant therapy". .id[49 (19-22)]. *Serious Injury:* [is] a physical injury which creates a substantial risk of death[5], or protracted loss or impairment of the function of any bodily organ[6]. Ecessive delays in medical treatment can constitute a act of deliberate indifference.

6)  Common - law Actions,  §5001(b) PERSONAL INJURY -- [In] a civil action brought to recover on account of an injury sustained in a place subject to the jurisdiction of the United States within a state, the right of the parties shall be governed by the law of the State in which the place is located.

7)  OS. §23-3(RL.1910,§2845). [any] person who suffers detriment from the unlawful act or omission of another, may recover from the person in fault a compensation "Money" called damages.

8)  [a]ny action arising from negligence in rendering medical care, or a presumption of negligence shall arise if the following foundations are established:
a)  plaintiff sustains [any] injury;
b)  said injury was proximately caused an instrumentality solely within the control of the defendant or defendants;
c)  such injury dose not ordinarily occur under the circumstances absent negligence on the part of the defendant. OS.§ 76-21(1976,c.44,§5,emerg. eff,April 8, 1976).

9)  On Nov, 18th Plaintiff complained of extreme weakness and excessive bleeding[7]..id[ECFNo. 49 (24)]. plaintiff states that he was bleeding from his tear-ducts, and later found his INR was 600+ extremely thin blood condition[7].

10)  Defendants were made aware of plaintiff's serious medical condition at booking..*see.[ECFNo. 49(12)]*.

11)  Plaintiff complained of not being supplied with *[clean]* drinking water. this expressed in the complaint on two(2) occasions...*id[Doc 49 (23&25), as there was none in the cells*. at all times stated the plaintiff requested to *receive clean drinking water*.

---

(5)..see*RX MEDICATION GUIDE[42-3 (13-16),and attached documents explaining* the characteristics and requirements of anticoagulation therapy. Showing that miss - practices, and excessive delays in treatment caused injuries averred by plaintiff.
(6)..*see.EXHIBIT 1-3*
(7)..*see.EXHIBIT 3-5*

# What is anticoagulation

Anticoagulation involves the management of prescribed medications (called blood thinners) to help prevent existing blood clots (thrombus) from growing larger.

Anticoagulation may also prevent the formation of new blood clots by increasing the amount of time it takes a blood clot to form.

The goal of anticoagulation is to slow down the clotting process and is therefore used to treat or prevent clots in the veins, arteries, lungs or heart.

Adapted from:
http://www.cvapc.com/handler.cfm?event=practice.template&cpid=26575
http://health.ucsd.edu/specialties/anticoagulation/patients/Pages/default.aspx
http://www.guideline.gov/content.aspx?id=35262
http://www.nlm.nih.gov/medlineplus/bloodthinners.html
http://www.utmb.edu/isg/hem/ORAL_ANTICOAG_THERAPY.htm

# Mitigate risks while taking anticoagulan



Adapted from:
http://www.cvapc.com/handler.cfm?event=practice.template&cpid=26575
http://health.ucsd.edu/specialties/anticoagulation/patients/Pages/default.aspx
http://www.guideline.gov/content.aspx?id=35262
http://www.nlm.nih.gov/medlineplus/bloodthinners.html
http://www.utmb.edu/lsg/hem/ORAL_ANTICOAG_THERAPY.htm

## What are the most common medications used for anticoagulation?

There are different types of anticoagulants that achieve this in different ways, including:



Adapted from:
http://www.cvapc.com/handler.cfm?event=practice.template&cpid=26575
http://health.ucsd.edu/specialties/anticoagulation/patients/Pages/default.aspx
http://www.guideline.gov/content.aspx?id=35262
http://www.nlm.nih.gov/medlineplus/bloodthinners.html
http://www.utmb.edu/lsg/hem/ORAL_ANTICOAG_THERAPY.htm

## What are the indications for anticoagulation monitoring or medication?

You may have a health condition that predisposes your blood to clotting unnecessarily, such as:

- Atrial fibrillation (an irregular, rapid heartbeat)
- Heart valve replacement
- Certain genetic disorders

Or, you may have a history of blood clots, such as:

- Stroke (CVA)
- Deep vein thrombosis (DVT)
- Pulmonary embolism (PE)
- Heart attack (MI)





Adapted from:
http://www.cvapc.com/handler.cfm?event=practice.template&cpid=26575
http://health.ucsd.edu/specialties/anticoagulation/patients/Pages/default.aspx
http://www.guideline.gov/content.aspx?id=35262
http://www.nlm.nih.gov/medlineplus/bloodthinners.html
http://www.utmb.edu/lsg/hem/ORAL_ANTICOAG_THERAPY.htm

# Medication Management

- ➤ Anticoagulation medications are high-risk drugs and therefore need close monitoring.
- ➤ An important dietary measure that must be regular and consistent is your intake of vitamin K because it is an important part of the blood clotting process.
- ➤ There is a very small window for therapeutic dosing: too much of a drug c. cause bleeding, and too little may lead to clotting.
- ➤ Do not start or stop taking these medications without first consulting your primary care provider.

Adapted from:
http://www.cvapc.com/handler.cfm?event=practice.template&cpid=26575
http://health.ucsd.edu/specialties/anticoagulation/patients/Pages/default.aspx
http://www.guideline.gov/content.aspx?id=35262
http://www.nlm.nih.gov/medlineplus/bloodthinners.html
http://www.utmb.edu/isg/hem/ORAL_ANTICOAG_THERAPY.htm

 The Prothrombin Time (PT) is the laboratory test of choice for monitoring the anticoagulation status of patients treated with oral anticoagulants (Coumarin, Warfarin, Coumadin).

 In most cases, an *INR of at least 2.0* is required for effective anticoagulation.

 The risk of bleeding increases with an increasing INR, and may increase dramatically above an INR of 4.5 - 5.0.

 INR ranges and length of treatment will vary, depending on your current health condition.

Adapted from:
http://www.cvapc.com/handler.cfm?event=practice.template&cpid=26575
http://health.ucsd.edu/specialties/anticoagulation/patients/Pages/default.aspx
http://www.guideline.gov/content.aspx?id=35262
http://www.nlm.nih.gov/medlineplus/bloodthinners.html
http://www.utmb.edu/lsg/hem/ORAL_ANTICOAG_THERAPY.htm

# What Blood Tests will be drawn?

If you require <u>anticoagulation therapy</u>, you will need to have your <u>blood tested regularly</u>. The blood test that that will be done is called the **Prothrombin Time (PT) or INR (International Normalized Ratio)**. The INR is a reflection of how fast your blood clots. Based on your health history, and current medical condition, your <u>primary care provider</u> will determine the target range for your INR, and will adjust the dose of your medication to achieve that target range.

*Must be involved.*

Adapted from:
http://www.cvapc.com/handler.cfm?event=practice.template&cpid=26575
http://health.ucsd.edu/specialties/anticoagulation/patients/Pages/default.aspx
http://www.guideline.gov/content.aspx?id=35263
http://www.nlm.nih.gov/medlineplus/bloodthinners.html
http://www.utmb.edu/lag/hem/ORAL_ANTICOAG_THERAPY.htm

## What are the potential side effects of anticoagulation therapy?

- ➢ Increased risk of bleeding is possible when combining anticoagulation medication with other drugs, therefore, ensure your provider is aware of your diet, and all your prescribed and over-the-counter medications.
- ➢ Major bleeding is an uncommon but serious side effect. Contact health services if any side effects develop from the anticoagulation medication, especially if the following occurs:
  - o Changes in the color of your urine or stool
  - o Vomit that is red or looks like coffee grounds
  - o Coughing up red-tinged secretions
  - o Excessive bleeding from the gums or nose
  - o Bruises that appear with no explanation in unexpected places

Adapted from:
http://www.cvapc.com/handler.cfm?event=practice.template&cpid=26575
http://health.ucsd.edu/specialties/anticoagulation/patients/Pages/default.aspx
http://www.guideline.gov/content.aspx?id=35262
http://www.nlm.nih.gov/medlineplus/bloodthinners.html
http://www.utmb.edu/isg/hem/ORAL_ANTICOAG_THERAPY.htm

**MEDICATION GUIDE**

**Amitriptyline Hydrochloride Tablets, USP**
**(am" i trip' tileen)**

**Antidepressant Medicines, Depression and other Serious Mental Illnesses, and Suicidal Thoughts or Actions**

Read the Medication Guide that comes with you or your family member's antidepressant medicine. This Medication Guide is only about the risk of suicidal thoughts and actions with antidepressant medicines. **Talk to your, or your family member's, healthcare provider about:**

- all risks and benefits of treatment with antidepressant medicines
- all treatment choices for depression or other serious mental illness

**What is the most important information I should know about antidepressant medicines, depression and other serious mental illnesses, and suicidal thoughts or actions?**

1. **Antidepressant medicines may increase suicidal thoughts or actions in some children, teenagers, and young adults within the first few months of treatment.**
2. **Depression and other serious mental illnesses are the most important causes of suicidal thoughts and actions. Some people may have a particularly high risk of having suicidal thoughts or actions.** These include people who have (or have a family history of) bipolar illness (also called manic-depressive illness) or suicidal thoughts or actions.
3. **How can I watch for and try to prevent suicidal thoughts and actions in myself or a family member?**

   ○ Pay close attention to any changes, especially sudden changes, in mood, behaviors, thoughts, or feelings. This is very important when an antidepressant medicine is started or when the dose is changed.

   ○ Call the healthcare provider right away to report new or sudden changes in mood, behavior, thoughts, or feelings.

   ○ Keep all follow-up visits with the healthcare provider as scheduled. Call the healthcare provider between visits as needed, especially if you have concerns about symptoms.

**Call a healthcare provider right away if you or your family member has any of the following symptoms, especially if they are new, worse, or worry you:**

- thoughts about suicide or dying
- attempts to commit suicide
- new or worse depression
- new or worse anxiety
- feeling very agitated or restless
- panic attacks
- trouble sleeping (insomnia)
- new or worse irritability
- acting aggressive, being angry, or violent
- acting on dangerous impulses
- an extreme increase in activity and talking (mania)
- other unusual changes in behavior or mood
- **Visual problems:** eye pain, changes in vision, swelling or redness in or around the eye

**What else do I need to know about antidepressant medicines?**

- **Never stop an antidepressant medicine without first talking to a healthcare provider.** Stopping an antidepressant medicine suddenly can cause other symptoms.
- **Visual problems:** Only some people are at risk for these problems. You may want to undergo an eye examination to see if you are at risk and receive preventative treatment if you are.
- **Antidepressants are medicines used to treat depression and other illnesses.** It is important to discuss all the risks of treating depression and also the risks of not treating it. Patients and their families or other caregivers should discuss all treatment choices with the healthcare provider, not just the use of antidepressants.
- **Antidepressant medicines have other side effects.** Talk to the healthcare provider about the side effects of the medicine prescribed for you or your family member.
- **Antidepressant medicines can interact with other medicines.** Know all of the medicines that you or your family member takes. Keep a list of all medicines to show the healthcare provider. Do not start new medicines without first checking with your healthcare provider.
- **Not all antidepressant medicines prescribed for children are FDA approved for use in children.** Talk to your child's healthcare provider for more information.

**Call your doctor for medical advice about side effects. You may report side effects to FDA at 1-800-FDA-1088.**

This Medication Guide has been approved by the U.S. Food and Drug Administration for all antidepressants.

For Medication Guides, please call Northstar Rx LLC at 1-800-206-7821.

I09-2014M

8113

Manufactured for: Northstar Rx LLC

Memphis, TN 38141.

Toll free number: 1-800-206-7821

Manufactured by: Sandoz Inc.

Princeton. NJ 08540.

**Medication Guide**

**Citalopram Tablets, USP**
**(sye tal' oh pram hye" droe broe' mide)**

Read the Medication Guide that comes with citalopram tablets before you start taking them and each time you get a refill. There may be new information. This Medication Guide does not take the place of talking to your healthcare provider about your medical condition or treatment. Talk with your healthcare provider if there is something you do not understand or want to learn more about.

**What is the most important information I should know about citalopram tablets?**

Citalopram tablets and other antidepressant medicines may cause serious side effects, including:

**1. Suicidal thoughts or actions:**
- **Citalopram tablets and other antidepressant medicines may increase suicidal thoughts or actions** in some children, teenagers, or young adults within the **first few months of treatment or when the dose is changed.**
- Depression or other serious mental illnesses are the most important causes of suicidal thoughts or actions.
- Watch for these changes and call your healthcare provider right away if you notice:
  - New or sudden changes in mood, behavior, actions, thoughts, or feelings, especially if severe.
  - Pay particular attention to such changes when citalopram tablets are started or when the dose is changed.

Keep all follow-up visits with your healthcare provider and call between visits if you are worried about symptoms.

**Call your healthcare provider right away if you have any of the following symptoms, or call 911 if an emergency, especially if they are new, worse, or worry you:**
- attempts to commit suicide
- acting on dangerous impulses
- acting aggressive or violent
- thoughts about suicide or dying
- new or worse depression
- new or worse anxiety or panic attacks
- feeling agitated, restless, angry or irritable
- trouble sleeping
- an increase in activity or talking more than what is normal for you
- other unusual changes in behavior or mood

**Call your healthcare provider right away if you have any of the following symptoms, or call 911 if an emergency. Citalopram tablets may be associated with these serious side effects:**

**2. Changes in the electrical activity of your heart (QT prolongation and Torsade de Pointes).**

This condition can be life-threatening. The symptoms may include:
- chest pain

Only some people are at risk for these problems. You may want to undergo an eye examination to see if you are at risk and receive preventative treatment if you are.

**Do not stop citalopram tablets without first talking to your healthcare provider.** Stopping citalopram tablets too quickly may cause serious symptoms including:
- anxiety, irritability, high or low mood, feeling restless or changes in sleep habits
- headache, sweating, nausea, dizziness
- electric shock-like sensations, shaking, confusion

**What are citalopram tablets?**

Citalopram tablets are a prescription medicine used to treat depression. It is important to talk with your healthcare provider about the risks of treating depression and also the risks of not treating it. You should discuss all treatment choices with your healthcare provider. Citalopram tablets are also used to treat:
- Major Depressive Disorder (MDD)

Talk to your healthcare provider if you do not think that your condition is getting better with citalopram tablets treatment.

**Who should not take citalopram tablets?**

Do not take citalopram tablets if you:
- are allergic to citalopram hydrobromide or escitalopram oxalate or any of the ingredients in citalopram tablets. See the end of this Medication Guide for a complete list of ingredients in citalopram tablets.
- take a monoamine oxidase inhibitor (MAOI). Ask your healthcare provider or pharmacist if you are not sure if you take an MAOI, including the antibiotic linezolid.
- Do not take an MAOI within 2 weeks of stopping citalopram tablets unless directed to do so by your physician.
- Do not start citalopram tablets if you stopped taking an MAOI in the last 2 weeks unless directed to do so by your physician.

**People who take citalopram tablets close in time to an MAOI may have serious or even life-threatening side effects. Get medical help right away if you have any of these symptoms:**
-
  - high fever
  - uncontrolled muscle spasms
  - stiff muscles
  - rapid changes in heart rate or blood pressure
  - confusion
  - loss of consciousness (pass out)
- **take the antipsychotic medicine pimozide (Orap®) because this can cause serious heart problems.**
- **have a heart problem including congenital long QT syndrome.**

**What should I tell my healthcare provider before taking citalopram tablets? Ask if you are not sure.**

# Medication Management

→ ➤ Anticoagulation medications are high-risk drugs and therefore need close monitoring.

*Delays in Administering caused injury*

➤ An important dietary measure that must be regular and consistent is your intake of vitamin K because it is an important part of the blood clotting process.

➤ There is a very small window for therapeutic dosing: too much of a drug c. cause bleeding, and too little may lead to clotting.

➤ Do not start or stop taking these medications without first consulting your primary care provider.

Adapted from:
http://www.cvapc.com/handler.cfm?event=practice.template&cpid=26575
http://health.ucsd.edu/specialties/anticoagulation/patients/Pages/default.aspx
http://www.guideline.gov/content.aspx?id=15262
http://www.nlm.nih.gov/medlineplus/bloodthinners.html
http://www.utmb.edu/lsg/hem/ORAL_ANTICOAG_THERAPY.htm

RX 6169729

FUROSEMIDE 20MG TABS

**GENERIC NAME:** Furosemide Tablets
**Brand Name:** Lasix
**IDENTIFICATION:**    Tablet
**IMPORTANT NOTE:** This information should not be used to decide whether or not to take this medicine or any other medicine. Only the healthcare provider has the knowledge and training to decide which medicines are right for a specific patient. This information does not endorse any medicine as safe, effective, or approved for treating any patient or health condition. This is only a brief summary of general information about this medicine. It does NOT include all information about the possible uses, directions, warnings, precautions, interactions, adverse effects, or risks that may apply to this medicine. This information is not specific medical advice and does not replace information you receive from the healthcare provider. You must talk with the healthcare provider for complete information about the risks and benefits of using this medicine.
**What is this drug used for?:** - It is used to get rid of extra fluid.
- It is used to treat high blood pressure.
**How is this drug best taken?:** Use this drug as ordered by your doctor. Read all information given to you. Follow all instructions closely.

- This drug may cause you to pass urine more often. To keep from having sleep problems, try to take before 6 pm.
- To gain the most benefit, do not miss doses.
- Take with or without food.
- Do not take sucralfate within 2 hours before or after taking this drug.
**What do I do if I miss a dose?**

- Take a missed dose as soon as you think about it.
- If it is close to the time for your next dose, skip the missed dose and go back to your normal time.
- Do not take 2 doses at the same time or extra doses.
**What are some other side effects of this drug?:** All drugs may cause side effects. However, many people have no side effects or only have minor side effects. Call your doctor or get medical help if any of these side effects or any other side effects bother you or do not go away:

- Hard stools (constipation).
- Loose stools (diarrhea).
- Dizziness.
- Upset stomach or throwing up.
- Headache.
These are not all of the side effects that may occur. If you have questions about side effects, call your doctor. Call your doctor for medical advice about side effects.
You may report side effects to the FDA at 1-800-FDA-1088. You may also report side effects at http://www.fda.gov/medwatch.
**What are some things I need to know or do while I take this drug?:** - Tell all of your health care providers that you take this drug. This includes your doctors, nurses, pharmacists, and dentists.
- Avoid driving and doing other tasks or actions that call for you to be alert until you see how this drug affects you.
- To lower the chance of feeling dizzy or passing out, rise slowly if you have been sitting or lying down. Be careful going up and down stairs.
- If you have high blood sugar (diabetes), you will need to watch your blood sugar closely.
- If you are on a low-salt or salt-free diet, talk with your doctor.
- If you are taking this drug and have high blood pressure, talk with your doctor before using OTC products that may raise blood pressure. These include cough or cold drugs, diet pills, stimulants, ibuprofen or like products, and some natural products or aids.
- Have your blood pressure checked often. Talk with your doctor.
- Have blood work checked as you have been told by the doctor. Talk with the doctor.
- You may need extra potassium. Talk with your doctor.
- Talk with your doctor before you drink alcohol or use other drugs and natural products that slow your actions.
- You may get sunburned more easily. Avoid sun, sunlamps, and tanning beds. Use sunscreen and wear clothing and eyewear that protects you from the sun.
- Watch for gout attacks.
- If you have lupus, this drug can make your lupus active or get worse. Tell your doctor right away if you get any new or worse signs.
- If you are 65 or older, use this drug with care. You could have more side effects.
- Use with care in children. Talk with the doctor.
- Tell your doctor if you are pregnant or plan on getting pregnant. You will need to talk about the benefits and risks of using this drug while you are pregnant.
- Tell your doctor if you are breast-feeding. You will need to talk about any risks to your baby.
**If OVERDOSE is suspected:** If you think there has been an overdose, call your poison control center or get medical care right away. Be ready to tell or show what was taken, how much, and when it happened.
**Consumer Information Use and Disclaimer:** - If your symptoms or health problems do not get better or if they become worse, call your doctor.
- Do not share your drugs with others and do not take anyone else's drugs.
- Keep a list of all your drugs (prescription, natural products, vitamins, OTC) with you. Give this list to your doctor.
- Talk with the doctor before starting any new drug, including prescription or OTC, natural products, or vitamins.
- Some drugs may have another patient information leaflet. Check with your pharmacist. If you have any questions about this drug, please talk with your doctor, nurse, pharmacist, or other health care provider.
- If you think there has been an overdose, call your poison control center or get medical care right away. Be ready to tell or show what was taken, how much, and when it happened.
**How do I store and/or throw out this drug?:** - Store at room temperature.
- Protect from light.
- Store in a dry place. Do not store in a bathroom.
- Keep all drugs in a safe place. Keep all drugs out of the reach of children and pets.
- Throw away unused or expired drugs. Do not flush down a toilet or pour down a drain unless you are told to do so. Check with your pharmacist if you have questions about the best way to throw out drugs. There may be drug take-back programs in your area.

CROSS-WARREN, ADRIAN V                                          PRICE CUTTER PHARMACY# 102

RX 6169730

AMITRIPTYLINE HCL 50MG TABS

---

**GENERIC NAME:** Amitriptyline
**Brand Name:** Elavil [DSC]
**IDENTIFICATION:**    Tablet
**IMPORTANT NOTE:** This information should not be used to decide whether or not to take this medicine or any other medicine. Only the healthcare provider has the knowledge and training to decide which medicines are right for a specific patient. This information does not endorse any medicine as safe, effective, or approved for treating any patient or health condition. This is only a brief summary of general information about this medicine. It does NOT include all information about the possible uses, directions, warnings, precautions, interactions, adverse effects, or risks that may apply to this medicine. This information is not specific medical advice and does not replace information you receive from the healthcare provider. You must talk with the healthcare provider for complete information about the risks and benefits of using this medicine.
**What is this drug used for?:** - It is used to treat low mood (depression).
- It may be given to you for other reasons. Talk with the doctor.
**How is this drug best taken?:** Use this drug as ordered by your doctor. Read all information given to you. Follow all instructions closely.

- Take at bedtime if taking once a day.
- To gain the most benefit, do not miss doses.
- Keep taking this drug as you have been told by your doctor or other health care provider, even if you feel well.
What do I do if I miss a dose?

- Take a missed dose as soon as you think about it.
- If it is close to the time for your next dose, skip the missed dose and go back to your normal time.
- Do not take 2 doses at the same time or extra doses.
**What are some other side effects of this drug?:** All drugs may cause side effects. However, many people have no side effects or only have minor side effects. Call your doctor or get medical help if any of these side effects or any other side effects bother you or do not go away:

- Hard stools (constipation).
- Dizziness.
- Feeling sleepy.
- Dry mouth.
- Feeling tired or weak.
- Headache.
- Upset stomach or throwing up.
- Not hungry.
- Loose stools (diarrhea).
- Anxiety.
- Feeling nervous and excitable.
- Change in taste.
- Weight gain or loss.
These are not all of the side effects that may occur. If you have questions about side effects, call your doctor. Call your doctor for medical advice about side effects.
You may report side effects to the FDA at 1-800-FDA-1088. You may also report side effects at http://www.fda.gov/medwatch.
**What are some things I need to know or do while I take this drug?:** - Tell all of your health care providers that you take this drug. This includes your doctors, nurses, pharmacists, and dentists. This drug may need to be stopped before certain types of surgery as your doctor has told you. If this drug is stopped, your doctor will tell you when to start taking this drug again after your surgery or procedure.
- Avoid driving and doing other tasks or actions that call for you to be alert until you see how this drug affects you.
- To lower the chance of feeling dizzy or passing out, rise slowly if you have been sitting or lying down. Be careful going up and down stairs.
- Do not stop taking this drug all of a sudden without calling your doctor. You may have a greater risk of signs of withdrawal. If you need to stop this drug, you will want to slowly stop it as ordered by your doctor.
- If you have high blood sugar (diabetes), you will need to watch your blood sugar closely.
- Tell your doctor if you have signs of high or low blood sugar like breath that smells like fruit, dizziness, fast breathing, fast heartbeat, feeling confused, feeling sleepy, feeling weak, flushing, headache, more thirsty or hungry, passing urine more often, shaking, or sweating.
- Talk with your doctor before you drink alcohol or use other drugs and natural products that slow your actions.
- Some people may have a higher chance of eye problems with this drug. Your doctor may want you to have an eye exam to see if you have a higher chance of these eye problems. Call your doctor right away if you have eye pain, change in eyesight, or swelling or redness in or around the eye.
- This drug may make you sunburn more easily. Use care if you will be in the sun. Tell your doctor if you sunburn easily while taking this drug.
- Be careful in hot weather or while being active. Drink lots of fluids to stop fluid loss.
- Some people who take this drug may get a very bad muscle problem called tardive dyskinesia. This muscle problem may not go away even if this drug is stopped. Sometimes, signs may lessen or go away over time after this drug is stopped. The risk of tardive dyskinesia may be greater in people with diabetes and in older adults, especially older women. The risk is also greater the longer you take this drug or with higher doses. Muscle problems may also occur after short-term use with low doses. Call your doctor right away if you have trouble controlling body movements or if you have muscle problems with your tongue, face, mouth, or jaw like tongue sticking out, puffing cheeks, mouth puckering, or chewing.
- If you are 65 or older, use this drug with care. You could have more side effects.
- Tell your doctor if you are pregnant or plan on getting pregnant. You will need to talk about the benefits and risks of using this drug while you are pregnant.
**If OVERDOSE is suspected:** If you think there has been an overdose, call your poison control center or get medical care right away. Be ready to tell or show what was taken, how much, and when it happened.
**Consumer Information Use and Disclaimer:** - If your symptoms or health problems do not get better or if they become worse, call your doctor.
- Do not share your drugs with others and do not take anyone else's drugs.
- Keep a list of all your drugs (prescription, natural products, vitamins, OTC) with you. Give this list to your doctor.
- Talk with the doctor before starting any new drug, including prescription or OTC, natural products, or vitamins.
- This drug comes with an extra patient fact sheet called a Medication Guide. Read it with care. Read it again each time this drug is refilled. If you have any questions about this drug, please talk with the doctor, pharmacist, or other health care provider.
- If you think there has been an overdose, call your poison control center or get medical care right away. Be ready to tell or show what was taken, how much, and when it happened.

## NOTICE OF TORT CLAIM

**A. CLAIMANT REPORT**     To the ___MUSKOGEE COUNTY SHERIFF'S OFFICE___

Public entity you are filing the claim against.

PLEASE PRINT OR TYPE AND SIGN

| IMPORTANT NOTICE: This notice shall be sent to the proper County Claims Dept. | You may expect them to contact you. |
|---|---|

CLAIMANT(S) __Adrian Cross__         CLAIMANT(S) SOCIAL SECURITY NO. __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__

ADDRESS __604 N. Denver st.__       CLAIMANT(S) DATE OF BIRTH __07/14/1964__    Circle: (M) F

__Spiro, OK. 74959__       PHONE: HOME (___)_____ BUS. (318) 527-7769

(Exact Date Required)      **(Continue on another sheet if needed**

1. DATE AND TIME OF INCIDENT __Nov/23/2019__ ( 9 ) a.m. (__) p.m.    **for any information requested)**
2. LOCATION OF INCIDENT __Muskogee County Jail__
3. DESCRIBE INCIDENT __Claimant charges the Muskogee County Jail Officials with deliberately, unlawfully withholding legal__
and personal US.Mail. Claimant is seeking damages for injury as direct result of the an instrument solely in the hands of the respondent.

**"SEE ATTACHMENTS"**

4. LIST ALL PERSONS AND/OR PROPERTY FOR WHICH YOU ARE CLAIMING DAMAGES:

BODILY INJURY: WAS CLAIMANT INJURED? YES___ NO___ If yes, complete this section

Describe injury _____

WERE YOU ON THE JOB AT THE TIME OF INJURY? YES___ NO___ If so, please provide Employer info.

| Employer's Name | Address | Phone |
|---|---|---|
| | ALL MEDICAL BILLS (attach copies) | $_____ |
| | LIST OTHER DAMAGES CLAIMED | $_____ |

MEDICARE/MEDICAID/SOCIAL SECURITY DISABILITY:

Is there any Social Security Disability involvement ___Yes ___No

Has any medical bill been paid or will be paid by Medicare/Medicaid? ___Yes ___No. If so, list Medicare/Medicaid Number.

Medicare/Medicaid Number _____

If the City is responsible for such bills, the City must report any settlement to Medicare/Medicaid.

I understand that the information requested is to assist the requesting insurance information arrangement to accurately coordinate benefits with Medicare/Medicaid and to meet its mandatory reporting obligation under Medicare Secondary Payer Act 42 U.S.C§1395y.

_____      _____

Medicare/Medicaid Beneficiary Name (please print)    Medicare/Medicaid Beneficiary Name Signature

PROPERTY DAMAGE: Proof that you are the owner of the vehicle or property allegedly damaged as specified in your claim will be required.

VEHICLE YEAR_____ MAKE _____ MODEL_____

NOTE: **If damage is to a vehicle, a photocopy of your motor vehicle title is required.**

IF NOT A VEHICLE, DESCRIBE PROPERTY AND LOSS_____

PROPERTY DAMAGE (Attach repair bills or estimates if available) $_____

LIST OTHER DAMAGES CLAIMED $_____

| 5. NAME OF YOUR INSURANCE CO. | POLICY NO. | AMOUNT CLAIMED | AMOUNT RECEIVED |
|---|---|---|---|
| _____ | _____ | $_____ | $_____ |

6. The names of any witnesses known to you:

See Attached...

| Name | Address | Phone Number |
|---|---|---|
| | | |
| Name | Address | Phone Number |

STATE THE EXACT AMOUNT OF COMPENSATION YOU WOULD ACCEPT AS FULL SETTLEMENT ON THIS CLAIM.

TOTAL CLAIM............$ __175,000.00__

_Adl Cross_              6/1/2020

SIGNATURE(S)                 DATE

CONTINUE ON THE BACK

## CERTIFICATE OF MAILING AND SERVICE

I hereby certify that on ___6/1/2020___, I placed true and correct copies of this document in the U.S. mail, certified mail, return receipt requested and postage fully paid to the Clerk of the district court for The Eastern District of Oklahoma, I request that the Clerk of Court forward copies of the document to, to all parties, entities listed below via the court's ECF syst.:

Clerk of the Court
U.S. District Court
101 North 5th ST.
Muskogee, OK. 74401

Johnson Hanan & Vosler
ATTORNEYS AT LAW
9801 North Broadway Extension
Oklahoma City, OK. 73114

Andy Artus
429 NE 50TH ST. FL2
OKLAHOMA CITY OK. 73105

Adrian Cross Pro Se
604 N. Denver st.
Spiro  74959
318-527-7769

sign _____
6/1/2020
Date

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| Adrian Cross _____, | ) | Case NO.  CIV-18-081-DAK-DBP |
| PLAINTIFF | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Terry Freeman, Rob Frazier, et al _____, | ) | **Affidavit** |
| DEFENDANT | ) | |
| | ) | |

## AFFIDAVIT

I   Adrian Cross  , on oath and under the penalty of perjury state that:

1. I am  Adrian Cross the Plaintiff in the action.
2. That the following facts are true to the best of my belief or knowledge.

A.  This affidavit is submitted to support my claim that the Muskogee County Jail (M.C.J.) failed to adhere to standards of incarceration set forth by Federal, and State Law, the American Correctional Association (A.C.A.) and the U.S.Marshals Services, for non-federal facilities that house federal pretrial detainees in the custody of the U.S. Marshals. And that the U.S. Marshals Services and the named defendants in the above action failed to properly over see my custody, and protect me against injury and violation of my rights under the United States Constitution.

B.  And  to support my claim that the Defendants violated my statutory and constitutional rights. And clearly failed to maintain a safe and humane facility.

C.  By way of the content of this affidavit I shall clearly exhibit my claims by use of the Federal Performance-Based Detention Standards Handbook, implemented by the  U.S. Department of Justice (D.O.J.) and the Office of the Federal Detention Trustee (O.F.D.T.) that was created pursuant to U.S.C. 28 § 530 C (b)(7). (2001).

D.  DETENTION TRUSTEE.—Funds available to the Attorney General for the Detention Trustee may be used for all the activities of such Trustee in the exercise of all power and functions authorized by law relating to the detention of Federal prisoners in non-Federal institutions or otherwise in the custody of the United States Marshals Service and to the detention of aliens in the custody of the Immigration and Naturalization Service, including the overseeing of construction of  detention facilities or for housing related to such detention, the management of funds appropriated to the Department for the exercise of detention functions, and the direction of the United States Marshals Service and Immigration Service with respect to the exercise of detention policy setting and operations for the Department of Justice.

E.  THE PERFORMANCE-BASED DETENTION STANDARDS February 2007
    Federal Performance-Based Detention Standards Handbook
    The Federal Performance-Based Detention Standards is based on the American
    Correctional Association Standards, and is designed for use in reviewing non-federal
    facilities that house federal detainees to ensure these facilities are safe, humane, and
    protect detainee's statutory and constitutional rights.

F.  Health Care Intake and Screening, upon my arrival to the Muskogee County (herein-
    after "M.C.J.") a member of the jails medical staff discontinued my mental medicine
    for several doses, *Id.III(19).* [w]ithout consulting a Doctor or Mental Health Doctor.
    Medical intake was performed 2-3 weeks after my arrival  [b]y a nurse with
    no Doctor present. Both incidents violate Detention healthcare standards see..Federal
    Perfomance-Based Detention Standard Handbook,(hereinafter"Standards Handbook")
    (B.1) [t]he facility director to ensure the medical, dental, and mental health screenings
    are performed at intake by licensed health care professionals. also see..(B.1.4) [i]ntake
    health screening is performed upon booking for inmates housed over 72 hours.

G.  I did not receive any hands on care from Dr. Cooper my entire 7mos stay at the (M.C.J)
    [d]espite written and verbal request to do so. This again violates detention healthcare
    standards, see.."Standards Handbook" (B.3.6) [r]equest are triaged through **visual**
    contact by a Healthcare Professional, within 24 hours on weekdays. also see..(B.3.8)
    Detainees with chronic medical problems should be **seen** regularly as illness dictate.

H.  A error in medical protocol by untrained,improperly supervised medical staff member
    mismanaged my medication compounding a near fatal injury. Proper use  of medical
    protocol and detention healthcare standards may have prevented the injury see.. (B.3.17)
    [t]reatment plans are developed and updated in a timely fashion by a physician.
    Had Dr. Cooper been more involved the outcome may have been favorable.

I.  My blood must be drawn and sent to a lab to monitor the blood thinners I take because
    of a increased blood clotting disorder, frequently. long delays and mismanagement of
    this medication and therapy protocol caused injury, *Again* a more concise and timely
    treatment and the Doctors involvement, see.."Standards Handbook"(B.3.17) (B.3.20),
    (B.3.20A), and (B.3.21A). .. attached

J.  I never once spoke with or seen a mental health professional in the seven (7) mos I was
    at (M.C.J.) [d]espite the medical staffs knowledge of use of mental medication.*Id.(d)(3)*
    again violation of detention healthcare standards, see..(B.3.39). ..attached

K.  Prompt care of my medical needs, better trained medical staff, with clear policies and
    diligent physician involvement may have prevented my physical and mental injuries. see
    (B.3.62) , (B.3.63).   and the remainder of the section attached.

L. The (M.C.J.) also presented security and safety issues that were known to staff and the jails administration were made aware of ..[c]ell door not able to close or lock, broken intercom. a violation of federal and state statue..see,(B.3.67), (C.1), (C.3) and (C.3.1) attached..

M. The issue of clean drinking water and dietary deficient meals, also violate detention standards see.. (D.1) and (D.2) attached..

N. Overcrowding at the (M.C.J.) has created unsanitary and dangerous conditions in regard to fire safety.*Id..(d)(2).* The "Standards Handbook" addressed this violation at (F.1)

O. There was no regard to safety of detainees or staff as classification did not exist, another correctional deficient oversight at the (M.C.J.) see..(G.1)

P. My constitutional right to religious freedom was trampled . *This should really be addressed.* see.. (G.2).

Q. Federal pretrial detainees are entitled to access the courts, a right addressed by the constitution, again my rights were violated . The (M.C.J.) is riddled with many statutory and constitutional violations..see..(G.6) thr (G.6.7) .

The afore mentioned deficient conditions of my incarceration at the (M.C.J.) clearly violated my constitutional rights and violated  pertinent state and federal correctional rules and regulations, statutes and laws.

Adrian  Cross

sign _____

signed in Panama , OK.

date  _0 - / - 2020_

Subscribed and sworn to before me, this _____ 1st _____

day of __June_____ , 20_20_ .

_____

NOTARY PUBLIC

My commission expires: 07/28 _____ , 20_20_ .

NOTARY PUBLIC State of OK
AMBER JOHNSTON
Comm. # 16007285
Expires 07-28-2020

## THE PERFORMANCE-BASED DETENTION STANDARDS

### Federal Performance-Based Detention Standards Handbook
The Federal Performance-Based Detention Standards is based on the American Correctional Association Standards, and is designed for use in reviewing non-federal facilities that house federal detainees to ensure these facilities are safe, humane, and protect detainee's statutory and constitutional rights.

I  HEALTH CARE: Intake Health Screening:

B.1 The Facility Director ensures that medical, dental, and mental health screenings are performed by trained, licensed health care professionals at intake and that follow-up action is taken, when necessary.

B.1.4 Intake health screening is performed upon booking for inmates house over 72 hours.

B.3.6 DETAINEE REQUESTS ARE TRIAGED TROUGH VISUAL CONTACT BY A HEALTHCARE PROFESSIONAL WITHIN 24 HOURS ON WEEKDAYS.

B.3.8 DETAINEES WITH CHRONIC MEDICAL PROBLEMS ARE SCHEDULED TO BE SEEN REGULARLY AS THERE ILLNESS DICTATE.

B.3.17 TREATMENT PLANS ARE DEVELOPED AND UPDATED IN A TIMELY FASHION BY A PHYSICIAN OR OTHER HEALTHCARE PROFESSIONAL.'

B.3.20 MEDICAL CARE IS PROVIDED TO DETAINEES.

B.3.20A THIS MEDICAL CARE IS PROVIDED UNDER THE DIRECTION AND SUPERVISION OF A DOCTOR.

B.3.21A POLICY DICTATES GUIDANCE FOR CARE AND DECISION MAKING FOR DETAINEES WITH SPECIAL NEEDS REQUIRING CLOSE MEDICAL SUPERVISION.'

B.3.39 **Ensure written policies and procedures exist for the provision of mental health services.**

 B.3.62 **Detainee emergent needs are handled promptly.**

 B.3.63 **Ensure written policies and procedures exist for the administration and distribution of medications.**

These policies include at least the implementation of subjects addressed in this section:

1.B.3.64 Policies and procedures are communicated to:

2.B.3.64a Appropriate staff members; and

3.B.3.64b Detainees, where appropriate.

4.B.3.65 Policies and procedures are reviewed and updated.

5.B.3.66 Records of administration and distribution of medication are properly  maintained and documented.

6.B.3.67 The facility complies with pertinent *state and federal rules and regulations*.

II   Effects of medications are properly monitored.

B.3.68 Medications are administered by properly trained staff consistent with
        state law.
B.3.76 Medical decisions are made by and oversight is provided by a
        designated, licensed, responsible physician.
B.3.82 Responsible physician ensures that improvements to patient care are
        made and identified problems are resolved to maintain a safe and
        humane facility.
B.3.78 Trained, non-licensed direct care personnel are supervised by
        the responsible health authority.
B.3.88  Detainee medical, dental and mental health information is kept
confidential.

III    written post orders

C.1 The Facility Director will establish separate written post orders that clearly
     outline duties, responsibilities, and expectations for every duty post.
C.3 The Facility Director ensures that inspections and/or reviews of all security
     features is conducted regularly in order to identify needed maintenance or
     there discrepancies. (K.7)
C.3.1 Ensure written policies and procedures exist for the inspections and/or
     reviews of facility security features. These policies include at least the
     implementation subjects addressed in this section:
     1. C.3.4 INSPECTION OF SECURITY FEATURES.
     2. C.3.4G SECURITY DOORS.
     3. C.3.5 QUALIFIED STAFF PERFORM INSPECTIONS.
     4. C.3.5D THERE ARE PROMPT FOLLOW-UP TO CORRECT ANY PROBLEMS.

D.1 The Facility Director ensures that the facility meets all local, state, and/or
     federal food service standards regarding sanitation procedures for
     purchasing, serving, staffing, transporting, cooking, utensils, equipment, and
     temperature requirements. (K.10)
D.2 The Facility Director ensures that nutritional and varied meals are provided.
(K.11)

F.1 The Facility Director ensures that a fire safety program conforming to all
     applicable local, state, and federal laws is in place.

## SECTION G:

**G.1** The Facility Director ensures that written policies and procedures are followed for the classification and reclassification of detainees to ensure the safe, secure, and humane housing of detainees. (K.16)

**G.2** The Facility Director ensures that detainees of all faiths have reasonable and equitable opportunities to participate in the practices of their faith. (K.17)

## IIII  SERVICES AND PROGRAMS:
Legal Materials (ICE, USMS  Standard (b))

**G.6** *THE DIRECTOR AFFORDS DETAINEES REASONABLE ACCESS TO LEGAL MATERIAL AND   REASONABLE OPPORTUNITY TO PRE PAIR IT AND COPY IT.*

**G.6.1** Ensure written policies and procedures exist for equitable access to legal materials and reasonable opportunities to prepare and copy legal documents. These policies include at least the implementation subjects addressed in this section:

1. G.6.4 Detainees are provided access to sufficient legal research materials and a reasonable opportunity to prepare legal documents.
2. G.6.5 Detainees are provided reasonable access to copies of unique forms required for agency processes and reasonable access to copying services for submission of documents to agencies and the courts.
3. G.6.6 Detainees are afforded access to sufficient writing materials, writing implements and postage.
4. G.6.7 Detainees have access to notary services to obtain notarization of documents for which there is a legal requirement of notarization.

**H.2** staff Training, Licensing, and Credentialing.

**H.2.6** Staff who deliver direct patient care are qualified by training, licensure, registration, and/or certification.

**III**  The Key Functional Areas are those areas that address the minimal requirements necessary to ensure detainees are housed in a safe, secure, and humane environment. While a facility's compliance with each of the functional areas will be evaluated, failure to comply with any Key Functional Areas will be considered a material deficiency in the operation of the facility. Use of facilities that fail to develop and implement a corrective action plan to ensure the facility can attain and maintain compliance with the Key Functional Areas may be discontinued. Additionally, if the facility is operating under a contract administrative fee deductions may be assessed.